The plaintiffs, a number of inhabitants in the city of New York, constituted one Groot their agent, to purchase the property of the "High Shoals Manufacturing company," (a corporation authorised by the Legislature of North Carolina,) which consisted of a number of gold mines, iron mines, a lime quarry, erections for mining and manufacturing, and seventeen slaves. The real property consisted of some fifteen thousand acres of land, which had been obtained by this company and their predecessors, from several distinct sources and in several quantities. Groot, the plaintiffs say, had been employed as an agent of the High Shoals Manufacturing Company, to effect a sale for them, but he was afterwards employed by plaintiffs, and proceeding to Gaston county, and having examined the property very diligently, he agreed to take the same at $75,000; accordingly, one-third of that sum was paid down, and Groot executed two bonds, payable on the 1st days of March and September, 1855, for $25,000, and Andrew Hoyl, the president of the said corporation, made and executed a deed of conveyance, but without warranty, for the said property, which was immediately thereafter conveyed back by Groot to Mr. Hoyl by a mortgage, dated 24th of February, 1854, to secure the payment of the two bonds of $25,000.
About this time the individuals, for whom Groot was acting, became a corporation by, and under the laws of, the State of New York, bearing the name and style of the "High Shoals Mining and Manufacturing Company," to whom he transferred and delivered all the property he had received from the North Carolina company.
The president of the North Carolina company, Andrew Hoyl, having died, and having, by will, constituted William P. Bynum and Thomas Grier his executors, they advertised *Page 134 
the whole of the property mortgaged to their testator, to be sold for the payment of the two bonds aforesaid, which had in the mean time, both became due.
This bill is filed by the New York company, to enjoin the proposed sale until certain defects in the title of the property, bought by them, shall be cured, and certain incumbrances removed, which greatly impair the value of the property; that one Ephraim Friday claims 120 acres of the land adjoining him; that Benjamin Ormond is claiming about 300 acres near the Ormond ore-bank; that Samuel Black, with others, claims about 500 acres; that Daniel Shuford claims sixty-three acres; that the chief gold-mine, on the property, was under a lease to one B. F. Briggs for ten years, which was yet unexpired, and that they had to give Briggs $12,600 to get rid of his lease; that a certain tract of land, called the lime quarry tract, described as being in Cleaveland county, could not be found at all; that limestone was a very important item in the operation of making iron, and the loss of this part of their purchase would be very disastrous to that branch of their business; that twenty-three acres in another parcel, containing the principal ore-bank, pertaining to the manufacturing operations, known as the Ormond ore-bank, is claimed by Oats and Fronebarger, under one Ormond, and they have brought a suit for the same, which is now pending in the Superior Court of Gaston county; that with this mining property, they bought, and had delivered to them, a quantity of goldore lying at the mine, and having taken possession thereof, they were sued for the same, by the administrators of one Joseph Shuford, who claimed the same as the property of their intestate, and the plaintiffs paid $1300, upon a compromise, to get rid of this claim; that the slaves are claimed by Messrs. Osborne and Graham, and the plaintiffs have been threatened with divers suits as to them by these persons; that these slaves are stated to be worth from 18 to 25 thousand dollars; that not wishing to be involved in litigation about them, they insisted that Hoyl should take back the slaves at a fair valuation, or sale, and give them credit on their bonds for the *Page 135 
amount of their value, and that the residue of the purchase-money should be paid as it became due; that unless they, the defendants, would do this, the plaintiffs would resist the payment of the bonds in a court of equity, until the litigation about to arise as to the title of the slaves, could be thus settled; that afterwards, two suits were actually brought by Osborne and Graham for the hire of these slaves from them by the plaintiffs; that in July, 1855, in reply to the proposition of plaintiffs, the president of the High Shoals Manufacturing Company, (the N.C. Co.) wrote the following letter to the plaintiffs:
"I have agreed with Mr. W. F. Olcott, your agent at High Shoals, to postpone the payment of certain bonds and mortgage, executed to me by P. W. Groot, for the sum of fifty thousand dollars, ($50,000) bearing date on or about the 24th of February, 1854, until the title to certain negroes, owned by the said mortgage, now in litigation, shall be determined, on condition, that the interest, which will be due on the 1st of September next, be paid by that day; and also, on condition, that should W. E. Rose, one of the directors of the old High Shoals Manufacturing Company, refuse to concur in this, that you furnish me, on or before said 1st of September, the sum of $8,300, to enable me to buy out his interest in the same."
The plaintiffs further allege, in their bill, that the interest above required, was promptly paid at the day, and $5,000, which was all that was required to adjust the claim of Rose, was also paid by the plaintiffs; that if a sale is forced, in the present depressed state of the money market, with these clouds upon the title to their property, the plaintiffs will suffer great detriment, and as they think, will be greatly oppressed. It is upon these grounds that they ask for an injunction to stay the sale of the property under the mortgage deed.
The defendants answer, denying that Groot was their agent in the transaction of the sale and purchase of the high shoals company, but that he acted throughout as the agent of the New York company, of which he was a member; that as to the lease *Page 136 
to Briggs, the said Groot was fully aware of its existence at the time he made the contract in behalf of the plaintiffs; that the same was the case as to the other difficulties in the titles to certain tracts of land now complained of, and that he distinctly understood the whole matter, and was willing and agreed to take the deed for the property without any warranty of the title, notwithstanding these difficulties; that in fact, these difficulties are greatly magnified in the plaintiffs' statement; that as to the "lime quarry" tract, it was sold without any description of boundary, other than the adjoining tracts and its name, but that by these it is well known and identified, and has been so for more than fifty years, all of which time, it has been the source from which the proprietors of the works at High Shoals, have obtained their limestone for fluxing; that as to the ore-bank, the suit by Fronebarger in Gaston Superior Court, is a contest as to where the line between the late company and one Ormond, shall be run; that their deed calls for Ormond's line, and as such, they sold to the plaintiffs, and if it does not include the ore-bank, they are not liable on their deed, or in anywise to blame; but they do not suppose there can be much difficulty as to these lines, as the plaintiffs have had possession for more than fifty years, claiming this particular ore-bank as their property; that as to the claim of Daniel Shuford, it is admitted by him to be untenable, but he is unwilling to surrender it voluntarily, as he has a covenant of warranty from one Passour, from whom he bought it.
As to the slaves, the defendants in their answer say, that the title of Osborne and Graham grew out of a conveyance made by Groot, after he had bought of Hoyl, and reconveyed to him by the mortgage deed, and that it cannot possibly affect the dealings between the plaintiffs and defendants. They deny the allegation that the ore was sold by Hoyl to the plaintiffs. As to the letter above set forth they say, that whether it be genuine or not, they do not know, but that if it be so, it was, nevertheless, [nevertheless] superseded by another contract, which they say was to the effect, that the plaintiffs were to have 'till *Page 137 
the 1st of January, 1859, to pay the two bonds of $25,000, on condition that the interest should paid yearly as it accrued, and as evidence, they produce what purports to be a copy of a letter from Mr. Hoyl to the plaintiffs, dated December, 1856, proposing those terms, and that the interest was in arrears when they urged the executors of Hoyl to advertise.
The executors say, that their testator was willing to take the slaves back, make sale of them, and give credit on the bonds as proposed by the plaintiffs, and they have been willing to do the same, but they have been deterred from that course by Osborne and Graham, who insist that the land shall be first sold, and they believe such was the motive of their testator for not accepting this proposition.
Upon the coming in of this answer, the defendants moved for the dissolution of the injunction, which was refused by his Honor, and the same was ordered to be continued until the hearing. From this order the defendants appealed.
The title of the slaves had become complicated by reason of the claim set up by Osborne and Graham under the deed of Goot, and the slaves constituted a very considerable proportion of the property which had been purchased by the plaintiffs. A difficulty was also presented by the lease of the gold-mine. This, the plaintiffs were forced to remove by the payment of some $12,000. It is true, the conveyance of the property, which was made to them, was without warranty, but it purported to convey a present
interest, and they had, at least, a plausible ground for insisting that it was the duty of the North Carolina company, (as it was termed in the argument,) the vendor of the premises, to remove the incumbrance. There was likewise a difficulty as to the "gold ore," which had been raised and was lying on the land, and the plaintiffs paid some $1,300 to remove it. So, there was a difficulty and a law-suit both in respect to the iron ore-bank *Page 138 
and the "lime-quarry." Under these circumstances, the plaintiffs, to avoid litigation, purpose to waive all other grounds of complaint, and pay the residue of the purchase-money, provided the North Carolina company would take, in part payment, the slaves at a proper valuation, so as to relieve the plaintiffs from the embarrassment caused by the claim of Osborne and Graham. This proposition is met by a "counter project," to wit: The North Carolina company will not require the payment of the principal money until the litigation in respect to the slaves is determined, provided the interest, which will be due on the 1st of September next, be paid, and also an amount sufficient to enable the company to make an arrangement with W. E. Rose. This proposition was accepted, the interest was paid, and also $5000, which the bill alleges, was the amount of cash required in order to effect the arrangement with Rose. The North Carolina company afterwards propose to postpone the collection of the principal money until February, 1859, provided the yearly interest is promptly paid.
This is a special, as distinguished from a common injunction. So, the bill is to be read as an affidavit, and taking "the whole together,`' the question is, ought the injunction to be dissolved, so as to permit the sale of the property at this time. We are clearly of opinion that, under the circumstances, it would be against conscience and fair dealing, to force the property into market until the title is cleared. We, therefore, concur with his Honor in the Court below. The motion to dissolve the injunction was properly refused. But the interlocutory order must be reversed; because the plaintiffs ought to have been required to pay the interest yearly accruing on 1st of September, in each and every year, so long as the injunction is continued.
There will be an interlocutory decree continuing the injunction "until further order," the plaintiffs paying the interest accrued up to the 1st of September last, and such as may accrue on the 1st of September in each year hereafter.
The purpose of holding up the injunction until further order, *Page 139 
instead of until the hearing, is to allow the defendants to move in the cause as they may be advised should the interest accruing after this time not be promptly paid, or should the litigation in respect to the slaves be sooner determined.
We see in this case and several others at this term, that the original papers are sent instead of a transcript. This is irregular, and the clerk of this Court is directed not to allow the original papers to be withdrawn from his office until a proper transcript is sent, to be filed nunc protunc; so that each court may preserve a proper memorial of the proceedings pending before it.
PER CURIAM, Decree according to the opinion.